UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No. _____

| | |
|---|---|
| RONALD LESKY, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>COMMUNITY LOAN SERVICING, LLC, )<br><br>Defendant. )<br>_____ ) | <u>CLASS ACTION</u><br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Ronald Lesky ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Defendant Community Loan Servicing, LLC ("CLS" or "Defendant").  Facts pertaining to Plaintiff and his personal experiences and circumstances are alleged based upon personal knowledge and all other facts herein are alleged based upon information and belief, *inter alia*, the investigation of Plaintiff's counsel.

### NATURE OF THE ACTION

1.      This is a class action for damages with respect to CLS for its failure to exercise reasonable care in securing and safeguarding its client's sensitive information – including names, Social Security numbers ("SSN"), and financial account information (collectively, "PII" or "Private Information").

2.      This class action is brought on behalf of customers who used CLS's services and had their sensitive PII accessed by unauthorized parties because of a lapse in network security from October 27, 2021 through December 7, 2021, inclusive (the "Data Breach").

3.      The Data Breach affected customers who use CLS's services in multiple states.

4.      CLS reported to Plaintiff that information compromised in the Data Breach included his PII.

5.      Plaintiff was not notified of the Data Breach until on or around October 17, 2022, more than one year after his information, which included his SSN, was first accessed.

6.      As a result of the Data Breach, Plaintiff and Class members (defined below) will experience, or have already experienced, various types of misuse of their PII in the coming years, including, but not limited to, unauthorized credit card charges, unauthorized access to email accounts, and other fraudulent use of their financial information.

7.      There has been no assurance offered from CLS that all personal data or copies of data have been recovered or destroyed.  CLS offered Kroll identity monitoring, which does not guarantee the security of Plaintiff's information.  However, in order to mitigate further harm, Plaintiff has signed up for Kroll identity monitoring offered by CLS.

8.      Accordingly, Plaintiff asserts claims for negligence, breach of contract, breach of implied contract, breach of fiduciary duty, bailment, unjust enrichment, breach of confidence, and violation of the New Jersey and Florida consumer protection statutes, and declaratory and injunctive relief.

## PARTIES

### A.    Plaintiff Ronald Lesky

9.      Plaintiff Ronald Lesky is a resident and citizen of Hillsdale, New Jersey, and brings this action in his individual capacity and on behalf of all others similarly situated.  Plaintiff

received a home loan from NJ Lenders Corp. located in Little Falls, New Jersey on or about April 28, 2021.  Plaintiff's mortgage was sold to CLS on or about July 7, 2021, approximately three months prior to the Data Breach.  Plaintiff and his spouse were required to provide detailed personal and financial information to NJ Lenders Corp. in order to secure the mortgage.  Plaintiff and his spouse submitted a joint application for their mortgage to NJ Lenders Corp.  Such information included their names, SSNs, driver's license numbers, and substantial personal financial account information which included all of their brokerage accounts.  This information was given to Defendant when they purchased Plaintiff's mortgage from NJ Lenders Corp.  In maintaining Plaintiff's and his spouse's Private Information, Defendant expressly and impliedly promised to safeguard the PII of Plaintiff and his spouse.  Defendant, however, did not take proper care of the PII of Plaintiff and his spouse, leading to its exposure as a direct result of Defendant's inadequate security measures.  In October 2022, Plaintiff received a notification letter from Defendant stating that his PII, which included Plaintiff's name and SSN, was compromised.

10.     The letter from Defendant also offered one year of identity monitoring through Kroll, which was and continues to be ineffective for Plaintiff and Class members.  However, in order to mitigate damages, Plaintiff signed up for this identity monitoring through Kroll.

11.     In the months and years following the Data Breach, Plaintiff and Class members will experience, or have already experienced, a slew of harms as a result of Defendant's ineffective data security measures.  Some of these harms will include fraudulent charges, requests for services taken out in customers' names, and targeted advertising without consent.

12.     These harms are not just theoretical.  Plaintiff has already spent at least ten hours on the phone, monitoring his credit accounts, and attempting to learn more about the scope of the Data Breach.  Plaintiff has notified his bank to make them aware that he was part of this Data

Breach.  Plaintiff and his spouse now regularly monitor their financial accounts since the Data Breach.  They receive credit reports on a regular basis and are monitoring those as well.  Plaintiff and his spouse have also put a freeze on their credit through the three credit bureaus.

13.     Plaintiff and his spouse greatly value their privacy, especially in the administration of their finances, and would not have done business with CLS had they known that their Private Information would be maintained using inadequate data security systems.

**B.      Defendant**

14.     Defendant Community Loan Servicing, LLC is a mortgage loan servicing and loan management limited liability company formed in Delaware that operates nationally, including in New Jersey.  CLS's principal place of business is located at 4425 Ponce de Leon Boulevard, Coral Gables, Florida 33146.  CLS's corporate policies and practices, including those used for data privacy, are established in, and emanate from the state of Florida.

<strong>JURISDICTION AND VENUE</strong>

15.     The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §1332(d)(2) because: (a) there are 100 or more class members; (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship; and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16.     The Court has personal jurisdiction over the Defendant because Defendant's principal place of business is located in this district.

17.     Venue is proper in this district under 28 U.S.C. §1391(b)(1) because Defendant maintains its principal place of business in this district and, therefore, resides in this district pursuant to 28 U.S.C. §1391(c)(2).  A substantial part of the events or omissions giving rise to the Class' claims also occurred in this district.

## FACTS

18.     Defendant services loans in all the states including Puerto Rico and Guam.  As part of its business, Defendant was entrusted with, and obligated to safeguard and protect, the Private Information of Plaintiff and the Class in accordance with all applicable law.

19.     Defendant learned of an incident that occurred between October 27, 2021, to December 7, 2021, in which a "security incident" allowed an unauthorized actor to access CLS customers' Private Information including names, SSNs, and driver's license numbers.  Defendant sent the following notice letter template which varies in length and detail to various state attorneys general:[1]

> Community Loan Servicing LLC ("CLS") understands the importance of protecting the information that we maintain.  We are writing to inform you of an incident that involved some of your information.  This notice explains the incident, measures we have taken, and steps you may consider taking.

> CLS currently or previously serviced your mortgage loan. A security incident involving unauthorized access to our file servers was identified in early December 2021.   Steps were immediately taken to contain the incident, notify law enforcement, and a forensic investigation firm was engaged.  The investigation determined that an unauthorized person obtained access to files on our file storage servers from October 27, 2021 to December 7, 2021.  The accessed files were then reviewed by our investigation team to identify the content.  On …, the review process determined that some of your information, including your name and Social Security number, was included in the files.  For some, the accessed files may also have included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.  The additional loan related information in the files is not the same for all individuals.

> We wanted to notify you of this incident and assure you that we take it seriously. We engaged Kroll, a third party with monitoring expertise, to provide identity monitoring services at no cost to you for one year.  The identity monitoring services include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration.

---

[1]     Office of the Vermont Attorney General, *Community Loan Servicing Data Breach Notice to Consumers* (Aug. 19, 2022), https://ago.vermont.gov/blog/2022/08/19/community-loan-servicing-data-breach-notice-to-consumers/.

Visit https://enroll.krollmonitoring.com to activate and take advantage of your identity monitoring services. You have until <> to activate your identity monitoring services. Membership Number: <>

For more information on your complimentary one-year membership, as well as additional steps you can take in response to the incident, please see the additional information provided in this letter.

We regret that this incident occurred and apologize for any inconvenience. Additional steps are being taken to further enhance our existing security measures. If you have questions about this notice, please call (855) 788-2606 from 8:00 a.m. – 5:30 p.m. Central Time, Monday through Friday (excluding major US holidays).

20.     Upon learning of the Data Breach in December of 2021, Defendant investigated. Although Defendant has not provided an estimate of how many customers were affected by the Data Breach, Defendant reported that the incident affected customers in multiple states including, but not limited to, New Jersey, California, Montana, Massachusetts, and Vermont.[2]

21.     In October 2022, Defendant announced through notice letters sent to its customers and notifications to various state attorneys general that it had conducted an investigation into the Data Breach and determined the scope and type of information that was included in the accessed files.

22.     Defendant offered no explanation for the delay between the initial discovery of the Breach and the belated notification to affected customers, which resulted in Plaintiff and Class members suffering harm they otherwise could have avoided had a timely disclosure been made.

23.     CLS's notice of Data Breach was not just untimely but woefully deficient, failing to provide basic details, including, but not limited to, how unauthorized parties accessed its networks, whether the information was encrypted or otherwise protected, how it learned of the

---

[2]     Various states require that data breach incidents affecting citizens within that state be reported to the attorney general's office within a reasonable period of time after the breach.  Defendant sent notice of the Data Breach to several states and its generic notice letter is recorded in multiple state attorneys general consumer protection data breach portals.  *See, e.g.*, *id.*

Data Breach, whether the breach occurred system-wide, whether servers storing information were accessed, and how many customers were affected by the Data Breach.  Even worse, CLS offered only one year of identity monitoring for Plaintiff and Class members, which, ironically, required their disclosure of additional PII with which CLS had just demonstrated it could not be trusted.

24.     Plaintiff's and Class members' PII is likely for sale to criminals on the dark web, meaning that unauthorized parties have accessed and viewed Plaintiff's and Class members' unencrypted, unredacted information, including names, addresses, SSNs, and driver's license numbers.

25.     The Data Breach occurred because Defendant failed to take reasonable measures to protect the Private Information it collected and stored.  Among other things, Defendant failed to implement data security measures designed to prevent this release of information, despite repeated warnings to financial companies about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past.

26.     Defendant disregarded the rights of Plaintiff and Class members by negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use.  As a result, Plaintiff's and Class members' PII was compromised through unauthorized access.  Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe.

**C.     Defendant's Privacy Promises**

27.     CLS made, and continues to make, various promises to its customers, including Plaintiff, that it will maintain the security and privacy of their Private Information.

28.     On its website under Privacy, Defendant states that "Community Loan Servicing, LLC recognizes the importance of keeping the personal information you provide to us private and secure.  Community Loan Servicing, LLC has developed a comprehensive privacy policy and we use the latest technology to ensure that your personal information is secure."  Under a section bolded and titled "Privacy Statement" Defendant states the following:[3]

> The personal, private information you provide to Community Loan Servicing, LLC will be used in connection with processing, underwriting, funding and servicing the loan for which you applied for.  Community Loan Servicing, LLC does not share any information about you or your company to unaffiliated third parties, except as necessary to process, underwrite, fund and service your loan and as permitted by law.  Community Loan Servicing, LLC may share information regarding your transaction and account experience, including name and payment history, among our affiliated financial services companies to better serve your needs and notify you of financial services that might interest you, as permitted by applicable law.  Community Loan Servicing, LLC does not share, distribute, sell or otherwise disseminate any information about you or your company, except as detailed above.

29.     In Defendant's separate Privacy Notice, which also contains an opt out mail-in form, CLS describes how it may use and disclose financial information for each category of uses or disclosures, none of which provide it a right to expose customers' Private Information in the manner it was exposed to unauthorized third parties in the Data Breach.[4]  "The types of personal information we collect and share depend on the product or service you have with us.  This information can include [the following]": SSN and income, account balance and payment history, and credit history and credit scores.[5]  In the Privacy Notice, CLS further represents that "To protect your personal information from unauthorized access and use, we use security measures that

---

[3]   *Privacy*, Cmty. Loan Servicing, https://communityloanservicing.com/privacy/(last visited Jan. 3, 2023).

[4]   *Privacy Notice*, Cmty. Loan Servicing, https://www.communityloanservicing.com/wp-content/uploads/NL009-CLS-Privacy-Notice-2020.pdf (last visited Jan. 3, 2023).

[5]   *Id*.

comply with federal law.   These measures include computer safeguards and secured files and buildings."[6]

30.     By failing to protect Plaintiff's and Class members' Private Information, and by allowing the Data Breach to occur, CLS broke these promises to Plaintiff and Class members.

**D.      Defendant Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Customer's Private Information**

31.     CLS acquires, collects, and stores a massive amount of its customers' protected PII, including financial information and other personally identifiable data.

32.     As a condition of engaging in financial and mortgage-related services, CLS requires that these customers entrust them with highly confidential Private Information.

33.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, CLS assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

34.     Defendant had obligations created by industry standards, common law, and representations made to Plaintiff and Class members, to keep the Private Information confidential and to protect it from unauthorized access and disclosure.

35.     Defendant failed to properly safeguard Class members' Private Information, allowing hackers to access their Private Information.

36.     Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant and any of its affiliates would

---

[6]   *Id*.

9

comply with their obligation to keep such information confidential and secure from unauthorized access.

37.    Prior to and during the Data Breach, Defendant promised customers that their Private Information would be kept confidential.

38.    Defendant's failure to provide adequate security measures to safeguard customers' Private Information is especially egregious because Defendant operates in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to customers' highly confidential Private Information.

39.    In fact, Defendant has been on notice for years that Plaintiff's and Class members' PII was a target for malicious actors.  Despite such knowledge, CLS failed to implement and maintain reasonable and appropriate security measures to protect Plaintiff's and Class members' PII from unauthorized access CLS should have anticipated and guarded against.

40.    Defendant was also on notice that the federal government has been concerned about data security.  In 2021, the Federal Trade Commission ("FTC") updated its consumer information Safeguards Rule, requiring non-banking financial institutions such as mortgage brokers, motor vehicle dealers, and payday lenders, to develop, implement, and maintain comprehensive security systems to keep their customer's information safe.  Against the backdrop of a rapid increase in cybersecurity incidents related to consumer financial information, Samuel Levine, the director of the FTC's Bureau of Consumer Protection, issued a warning stating that "Financial institutions and other entities that collect sensitive consumer data have a responsibility to protect it."[7]

---

[7]    Press Release, *FTC Strengthens Security Safeguards for Consumer Financial Information Following Widespread Data Breaches*, Fed. Trade Comm'n (Oct. 27, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-strengthens-security-safeguards-consumer-financial-information-following-widespread-data.

41.     The number of data breaches of companies based in the United States surpassed 1,000 in 2016, a record high and a 40% increase in the number of data breaches from the previous year.[8]   In 2017, a new record high of 1,579 breaches were reported – representing a 44.7% increase.[9]  That trend continues.  The First American Financial Mortgage data breach incident in 2019, for example, exposed hundreds of millions of users' financial information to cybercriminals.[10]

42.     The average time to identify and contain a data breach is 287 days,[11] with some breaches going unrecognized for months leading to costly recover efforts and financial impact. Additionally, the median cost per U.S. consumer incurred on each fraud-related data breach incident in 2020 was $450.[12]  Data breaches and identity theft have a crippling effect on individuals and detrimental impact on the economy as a whole.[13]

---

[8]    *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, CyberScout (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.

[9]    *2017 Annual Data Breach Year-End Review*, Identity Theft Res. Ctr., https://www.idtheftcenter.org/wp-content/uploads/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf   (last visited Jan. 3, 2023).

[10]   *First American Financial Breach Exposes Millions of Complete Identities*, identity theft res. ctr. (May 28, 2019), https://www.idtheftcenter.org/post/first-american-financial-breach-exposes-millions-of-complete-identities/.

[11]   *Cost of a Data Breach Report*, IBM Sec. (2021) at 6, https://www.ibm.com/downloads/cas/OJDVQGRY ("*Cost of a Data Breach Report*").

[12]   *Facts + Statistics: Identity theft and cybercrime*, Ins. Info. Inst. (2020), https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#top.

[13]   *Id.*

43.     A 2021 study conducted by Verizon showed that internal mismanagement of data security, including mis-delivery of emails, represents nearly 44% of the data breaches in the financial sector.[14]  The majority of these incidents involve the sending or releasing of information to unauthorized actors.[15]

44.     PII-related data breaches continued to rapidly rise into 2021 when CLS was breached.[16]

45.     Almost half of the data breaches globally are caused by internal errors, either human mismanagement of sensitive information or system errors.[17]  Cybersecurity firm Proofpoint reports that since 2020, there has been an increase of internal threats through the misuse of security credentials or the negligent release of sensitive information.[18]  To mitigate these threats, Proofpoint recommends that firms take the time to train their employees about the risks of such errors.[19]

46.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[20]

---

[14]   DBIR 2021 Data Breach Investigations Report, Verizon (2021) at 75, https://www.verizon.com/business/resources/reports/2021/2021-data-breach-investigations-report.pdf.

[15]   *Id.*

[16]   *2019 HIMSS Cybersecurity Survey*, HiMSS, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited Jan. 3, 2023).

[17]   *Cost of a Data Breach Report*, *supra* note 11, at 30.

[18]   *The Human Factor 2022*, proofpoint, https://www.proofpoint.com/sites/default/files/threat-reports/pfpt-us-tr-human-factor-report.pdf (last visited Jan. 3, 2023).

[19]   *Id.*

[20]   *See How to Protect Your Networks from RANSOMWARE*, FBI (2016), https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

47.     To prevent and detect unauthorized access, including the systems changes that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices.  Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege; no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls – including file, directory, and network share permissions – with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

48.     To prevent and detect unauthorized access to its systems, including the unauthorized access that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States government, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (*e.g.*, contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (*e.g.*, .com instead of .net).

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it.

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group

14

website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters – and keep them updated – to reduce malicious network traffic.[21]

49. To prevent the unauthorized access that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

  - Apply the latest security updates

  - Use threat and vulnerability management

  - Perform regular audit; remove privilege credentials

- **Thoroughly investigate and remediate alerts**

  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**

  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

- **Build credential hygiene**

  - use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities

  - Hunt for brute force attempts

---

[21] *See Security Tip (ST19-001) Protecting Against Ransomware*, Cybersecurity & Infrastructure Sec. Agency (Apr. 11, 2019 revised Sept. 2, 2021), https://us-cert.cisa.gov/ncas/tips/ST19-001.

- • Monitor for cleanup of Event Logs

- • Analyze logon events

- **Harden infrastructure**

  - • Use Windows Defender Firewall

  - • Enable tamper protection

  - • Enable cloud-delivered protection

  - • Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[22]

50.     These are basic, common-sense email security measures that every business, not only those who handle sensitive financial information, should be doing. CLS, with its heightened standard of care should be doing even more.  But, by adequately taking these common-sense solutions, CLS could have prevented this Data Breach from occurring.

51.     Charged with handling sensitive PII including financial information, CLS knew, or should have known, the importance of safeguarding its customers' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached.  This includes the significant costs that would be imposed on CLS's customers as a result of a breach.  CLS failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

52.     With respect to training, CLS specifically failed to:

---

[22]     *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020), https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

(a)       Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

(b)       Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

(c)       Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

53.       The PII was also maintained on CLS's computer system in a condition vulnerable to cyberattacks such as through the infiltration of Defendant's negligently maintained systems. The mechanism of the unauthorized access and the potential for improper disclosure of Plaintiff's and Class members' PII was a known risk to CLS and, thus, CLS was on notice that failing to take reasonable steps necessary to secure the PII from those risks left the PII in a vulnerable position.

**E.       The Monetary Value of Privacy Protections and Private Information**

54.       The fact that Plaintiff's and Class members' Private Information was stolen – and is likely presently offered for sale to cyber criminals – demonstrates the monetary value of the Private Information.

55.       At all relevant times, Defendant was well aware that Private Information it collects from Plaintiff and Class members is highly sensitive and of significant property value to those who would use it for wrongful purposes.

56.       Private Information is a valuable property right that is an important commodity to identity thieves.  As the FTC recognizes, identity thieves can use this information to commit an

array of crimes including identify theft and financial fraud.[23]   Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII including sensitive financial information on multiple underground Internet websites, commonly referred to as the dark web.

57.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[24]

58.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[25]

59.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.

---

[23]  *What to Know About Identity Theft*, Fed. Trade Comm'n (Sept. 2018), https://consumer.ftc.gov/articles/what-know-about-identity-theft.

[24]  *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, Fed. Trade Comm'n Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[25]  *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, WALL ST. J. (Feb. 28, 2011), https://www.wsj.com/articles/SB10001424052748703529004576160764037920274 ("*Web's New Hot Commodity*").

Data is currency.  The larger the data set, the greater potential for analysis – and profit.[26]

60.    Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[27]  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information.  And, by making the transaction transparent, consumers will make a profit from their Private Information.  This business has created a new market for the sale and purchase of this valuable data.

61.    Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable.  Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[28]

62.    The value of Plaintiff's and Class members' Private Information on the black market is substantial.  Sensitive financial information can sell for as much as $1000.[29]  This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's information.

---

[26]  *Statement of FTC Commissioner Pamela Jones Harbour, Remarks Before FTC Exploring Privacy Roundtable*, Fed. Trade Comm'n (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[27]  *Web's Hot New Commodity*, *supra* note 23.

[28]  *See* Erika Harrell, Phd.D., *Victims of Identity Theft, 2014*, U.S. Dep't of Justice, Office of Justice Programs: Bureau of Justice Statistics (Nov. 13, 2017) at 1, https://www.bjs.gov/content/pub/pdf/vit14.pdf  ("*Victims of Identity Theft*").

[29]  *See* Zachary Ignoffo, *Dark Web Price Index 2021*, Privacy Affairs (Nov. 21, 2021), https://www.privacyaffairs.com/dark-web-price-index-2021/.

63.     The ramifications of CLS's failure to keep its customers' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.  Fraudulent activity might not show up for six to 12 months or even longer.

64.     Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[30]  This gives thieves ample time to make fraudulent charges under the victim's name.

65.     At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.  Defendant should have been particularly aware of these risks given the significant number of data breaches affecting the financial industry and related industries.

66.     Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the ransomware attack into its systems and, ultimately, the theft of its customers' Private Information.

67.     The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.   Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification

---

[30] *See      Medical      ID      Theft      Checklist*,      IdentityForce https://web.archive.org/web/20210615024429/https://www.identityforce.com/blog/medical-id-theft-checklist-2.

of a consumer, computer, or device even if the individual pieces of data do not constitute PII."[31] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[32] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class members that was misused.

68.     In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible.  This is known as the "mosaic effect."

69.     Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.  Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

70.     Given these facts, any company that transacts business with customers and then compromises the privacy of customers' Private Information has thus deprived customers of the full monetary value of their transaction with the company.

---

[31]  *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report* at 35-38, Fed. Trade Comm'n (Dec. 2010),          https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-preliminary-ftc-staff-report-protecting-consumer/101201privacyreport.pdf.

[32]  *See id.* at 22 (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

71.     Acknowledging the damage to Plaintiff and Class members, Defendant instructed customers like Plaintiff to "review[] your account statements and credit reports for any unauthorized activity."  Plaintiff and the other Class members now face a greater risk of identity theft.

72.     In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names. Plaintiff and Class members have a property interest in their information and were deprived of this property when it was released to unauthorized actors through the negligent maintenance of Defendant's systems.

**F.     CLS Failed to Comply with FTC Guidelines**

73.     CLS was prohibited by the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. §45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is "unfair practice" in violation of the FTC Act.  *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

74.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.[33]

---

[33] *Start With Security: A Guide for Business*, Fed. Trade. Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf ("*Start with Security*").

75.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[34]  The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.

76.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to private data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[35]

77.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.     CLS was at all times fully aware of its obligation to protect the Private Information of customers because of its position as a trusted mortgage lender.  CLS was also aware of the significant repercussions that would result from its failure to do so.

---

[34]     *Protecting Personal Information: A Guide for Business*, Fed. Trade. Comm'n (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[35]     *Start With Security*, *supra* n.33.

G.     **Damages to Plaintiff and the Class**

79.     Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

80.     The ramifications of CLS's failure to keep customers' Private Information secure are long-lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to the victims may continue for years.  Consumer victims of data breaches are more likely to become victims of identity fraud.[36]

81.     In addition to its obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

82.     Defendant further owed and breached its duty to Plaintiff and Class members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

83.     As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class members' Private Information as detailed above, and Plaintiff and Class members are now at a heightened and increased risk of identity theft and fraud.

---

[36]  *2014 LexisNexis True Cost of Fraud Study*, *Post-Recession Revenue Growth Hampered by Fraud As All Merchants Face Higher Costs* LexisNexis (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

84.     The risks associated with identity theft are serious.  While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record.  Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports.  In rare cases, they may even be arrested for crimes they did not commit.

85.     Some of the risks associated with the loss of Private Information have already manifested themselves in Plaintiff's case.  Plaintiff received a cryptically written notice letter from Defendant stating that his information was released, and that he should remain vigilant of fraudulent activity on his accounts, with no other explanation of where this information could have gone, or who might have access to it.  Plaintiff has already spent hours on the phone trying to determine what negative effects may occur from the loss of his Private Information as well as contacting his bank and the credit agencies to put a freeze on his and his spouse's credit, reviewing credit reports and their financial accounts on a regular basis as well as researching and signing up for credit monitoring.

86.     Plaintiff and the Class have suffered or face a substantial risk of suffering out-of-pocket losses such as fraudulent charges on online accounts, credit card fraud, loans opened in their names, and similar identity theft.

87.     Plaintiff and Class members have, may have, and/or will have incurred out of pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

88.     Plaintiff and Class members did not receive the full benefit of the bargain, and instead received services that were of a diminished value to that described in their agreements with

CLS.  They were damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and the services they received.

89.     Plaintiff and Class members would not have obtained services from Defendant had Defendant told them that it failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from theft.

90.     Plaintiff and the Class will continue to spend significant amounts of time to monitor their financial accounts for misuse.

91.     The theft of SSNs, which were purloined as part of the Data Breach, is particularly detrimental to victims.  The U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest growing crimes in America."[37]  The SSA has stated that "[i]dentity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought."[38]  In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[39]

92.     In fact, a new SSN is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems.  If the old credit information is not associated with your new

_____

[37] *Identity Theft and Your Social Security Number*, Social Sec. Admin. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.

[38] *Id.*

[39] *Id.*

number, the absence of any credit history under your new number may make it more difficult for you to get credit."[40]

93.     Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.  Private Information can be used to submit false insurance claims.  As a result, Plaintiff and Class members now face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their SSNs and will need to monitor their credit for an indefinite duration.  For Plaintiff and Class members, this risk creates unending feelings of fear and annoyance.  Private information is especially valuable to identity thieves.  Defendant knew or should have known this and strengthened its data systems accordingly.  Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

94.     As a result of the Data Breach, Plaintiff's and Class members' Private Information has diminished in value.

95.     The Private Information belonging to Plaintiff and Class members is private and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.  Defendant disclosed information about Plaintiff and the class that was of an extremely personal, sensitive nature as a direct result of its inadequate security measures.

96.     The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff's and Class members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations,

---

[40] *Id.*

industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

97.     Defendant had the resources necessary to prevent the Data Breach but neglected to adequately implement data security measures despite its obligation to protect customer data.

98.     Defendant did not properly train their employees to identify and avoid unauthorized access to the network.

99.     Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class members' Private Information.

100.    As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family to mitigate the actual and potential impact of the Data Breach on their lives.

101.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[41]

102.    Other than offering one year of identity monitoring, Defendant did not take any measures to assist Plaintiff and Class members other than telling them to simply do the following:

_____

[41]    *See Victims of Identity Theft*, *supra* n.28.

(a)     remain vigilant for incidents of fraud and identity theft;

(b)     review account statements and monitor credit reports for unauthorized activity;

(c)     obtain a copy of free credit reports;

(d)     contact the FTC and/or the state Attorney General's office;

(e)     enact a security freeze on credit files; and

(f)     create a fraud alert.

None of these recommendations, however, require Defendant to expend any effort to protect Plaintiff's and Class members' Private Information.

103.    Defendant's failure to adequately protect Plaintiff's and Class members' Private Information has resulted in Plaintiff and Class members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendant sits by and does nothing to assist those affected by the incident.  Instead, as CLS's Data Breach Notice indicates, it is putting the burden on Plaintiff and Class members to discover possible fraudulent activity and identity theft.

104.    While Defendant offered one year of identity monitoring, Plaintiff could not trust a company that had already breached his data.  The identity monitoring offered from Kroll does not guarantee privacy or data security for Plaintiff, who would have to expose his information once more to get monitoring services.  Thus, to mitigate harm, Plaintiff and Class members are now burdened with indefinite monitoring and vigilance of their accounts.

105.    Moreover, the offer of one year of identity monitoring to Plaintiff and Class members is woefully inadequate.  While some harm has already begun, the worst may be yet to come.  There may be a time lag between when harm occurs versus when it is discovered, and

between when Private Information is acquired and when it is used.  Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Private Information) – it does not prevent identity theft.[42]  This is especially true for many kinds of financial identity theft, for which most identity monitoring plans provide little or no monitoring or protection.

106.    Plaintiff and Class members have been damaged in several other ways as well. Plaintiff and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information.  Plaintiff and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity.  Plaintiff and Class members also suffered a loss of the inherent value of their Private Information.

107.    The Private Information stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft.  Thieves can also use the stolen Private Information to send spear-phishing emails to Plaintiff and Class members to defraud them into revealing sensitive information.  Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

108.    As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

---

[42]  *See, e.g.*, Kayleigh Kulp, *Credit monitoring services may not be worth the cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

(a)     the compromise, publication, theft and/or unauthorized use of their Private Information;

(b)     out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

(c)     lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

(d)     the continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Private Information in its possession;

(e)     current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members; and

(f)     anxiety and distress resulting fear of misuse of their Private Information.

109.   In addition to a remedy for the economic harm, Plaintiff and Class members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

110.   Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure 23.

111.   Plaintiff proposes the following Class definitions, subject to amendment based on information obtained through discovery:

31

**Nationwide Class**

> All persons nationwide whose Private Information was compromised as a result of the Data Breach discovered on or about December 2021 and who were sent notice of the Data Breach.

**New Jersey Subclass**

> All persons residing in New Jersey whose Private Information was compromised as a result of the Data Breach discovered on or about December of 2021 and who were sent notice of the Data Breach.

Excluded from the Class are Defendant and Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

112.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

113.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**.  The members of the Class are so numerous that joinder of all Class members would be impracticable.  On information and belief, the Nationwide Class numbers in the thousands.

114.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**.  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

- Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

- Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

- Whether Defendant properly implemented its purported security measures to protect Plaintiff's and the Class' Private Information from unauthorized capture, dissemination, and misuse;

- Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;

- Whether Defendant disclosed Plaintiff's and the Class' Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

- Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class' Private Information;

- Whether Defendant was negligent in failing to properly secure and protect Plaintiff's and the Class' Private Information;

- Whether Defendant was unjustly enriched by its actions; and

- Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

115. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

116. **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

117. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiff is an adequate representative of the Nationwide Class because his interests do not conflict with the interests of the Classes he seeks to represent, he has retained counsel competent and

experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiff and his counsel.

118.    **Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**.  Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

119.    **Superiority – Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if members of the Class could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I

### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively, Plaintiff and the New Jersey Subclass)**

120.    Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

121.    Upon Defendant accepting and storing the Private Information of Plaintiff and the Class in their computer systems and on their networks, Defendant undertook and owed a duty to

Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendant knew that the Private Information was private and confidential and should be protected as private and confidential.

122. Defendant owed a duty of care not to subject Plaintiff's and the Class' Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

123. Defendant owed numerous duties to Plaintiff and the Class, including the following:

(a) to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in their possession;

(b) to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

(c) to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

124. Defendant also breached its duty to Plaintiff and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering their dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff's and Class members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

125.    Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches.

126.    Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff's and Class members' Private Information.

127.    Defendant breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' Private Information.

128.    Because Defendant knew that a breach of its systems would damage thousands of its customers, including Plaintiff and Class members, Defendant had a duty to adequately protect its data systems and the Private Information contained therein.

129.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its customers, which is recognized by laws and regulations including, but not limited to, common law.  Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

130.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

131.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

132.     Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information. Defendant's misconduct included failing to: (a) secure Plaintiff's and Class member's Private Information; (b) comply with industry standard security practices; (c) implement adequate system and event monitoring; and (d) implement the systems, policies, and procedures necessary to prevent this type of data breach.

133.     Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' Private Information, and by failing to provide timely notice of the Data Breach.  The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

(a)     failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

(b)     failing to adequately monitor the security of Defendant's networks and systems;

(c)     allowing unauthorized access to Class members' Private Information;

(d)     failing to detect in a timely manner that Class members' Private Information had been compromised; and

(e)     failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

134.     Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and failure to protect Plaintiff's and Class members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure

Plaintiff's and Class members' Private Information during the time it was within Defendant's possession or control.

135.    Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class members with timely notice that their sensitive Private Information had been compromised.

136.    Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

137.    As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

138.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, for example: (a) strengthen data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide lifetime free identity monitoring to all Class members.

### COUNT II

### BREACH OF CONTRACT
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively, Plaintiff and the New Jersey Subclass)**

139.    Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

140.    Plaintiff and Class members entered into valid and enforceable express contracts with Defendant and/or its affiliated companies under which Plaintiff and other Class members agreed to provide their Private Information to Defendant, and Defendant agreed to provide financial services and, impliedly, if not explicitly, agreed to protect Plaintiff's and Class members' Private Information.

141.     To the extent Defendant and/or its affiliated companies' obligation to protect Plaintiff's and other Class members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendant and/or its affiliated companies to implement data security adequate to safeguard and protect the confidentiality of Plaintiff's and other Class members' Private Information, including in accordance with trade regulations; federal, state and local laws; and industry standards.  No person would have entered into these contracts with Defendant and/or its affiliated companies without understanding that their Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

142.     A meeting of the minds occurred, as Plaintiff and/or other Class members agreed, among other things, to provide their Private Information in exchange for Defendant's and/or its affiliated companies' agreement to protect the confidentiality of that Private Information.

143.     The protection of Plaintiff's and Class members' Private Information were material aspects of Plaintiff's and Class members' contracts with Defendant and/or its affiliated companies.

144.     Defendant's promises and representations described above relating to industry practices, and about Defendant's purported concern about its clients' privacy rights became terms of the contracts between Defendant and its clients, including Plaintiff and other Class members. Defendant breached these promises by failing to comply with reasonable industry practices.

145.     Plaintiff and Class members read, reviewed, and/or relied on statements made by or provided by Defendant and/or its affiliated companies and/or otherwise understood that Defendant and/or its affiliated companies would protect its customers' Private Information if that information were provided to Defendant and/or its affiliated companies.

146.     Plaintiff and Class members fully performed their obligations under the implied contract with Defendant and/or its affiliated companies; however, Defendant did not.

147.     As a result of Defendant's breach of these terms, Plaintiff and other Class members have suffered a variety of damages including, but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure services Defendant promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and Class members have been put at increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take years to manifest, discover, and detect.

148.     Plaintiff and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

## COUNT III

### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Nationwide Class, or Alternatively, Plaintiff and the New Jersey Subclass)

149.     Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

150.     Plaintiff brings this claim for breach of implied contract alternatively to his breach of contract claim.

151.     Through their course of conduct, Defendant, Plaintiff, and Class members entered into implied contracts for the provision of financial services, as well as implied contracts for the

Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class members' Private Information.

152.    Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendant and/or its affiliated companies when he first entered into the financial services agreement with Defendant and/or its affiliated companies.

153.    The valid and enforceable implied contracts to provide financial services that Plaintiff and Class members entered into with Defendant and/or its affiliated companies include Defendant's promise to protect nonpublic Private Information given to Defendant or that Defendant creates on its own from disclosure.

154.    When Plaintiff and Class members provided their Private Information to Defendant and/or its affiliated companies in exchange for financial services, they entered into implied contracts with Defendant and/or its affiliated companies pursuant to which Defendant agreed to reasonably protect such information.

155.    Defendant and/or its affiliated companies solicited and invited Class members to provide their Private Information as part of Defendant and/or its affiliated companies' regular business practices. Class members accepted Defendant and/or its affiliated companies' offers and provided their Private Information to Defendant.

156.    In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

157.    Class members who paid money to Defendant and/or its affiliated companies reasonably believed and expected that Defendant and/or its affiliated companies would use part of those funds to obtain adequate data security.  Defendant failed to do so.

158.    Under implied contracts, Defendant and/or its affiliated companies promised and were obligated to: (a) provide financial services to Plaintiff and Class members; and (b) protect Plaintiff's and Class members' Private Information provided to obtain such benefits of such services. In exchange, Plaintiff and members of the Class agreed to pay money for these services and turn over their Private Information.

159.    Both the provision of financial services and the protection of Plaintiff's and Class members' Private Information were material aspects of these implied contracts.

160.    The implied contracts for the provision of financial services – contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class members' Private Information – are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's Data Breach notification letter.

161.    Defendant's express representations, including, but not limited to, the express representations found in its Privacy Notice, memorializes and embodies the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and protect the privacy of Plaintiff's and Class members Private Information.

162.    Consumers of financial services value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining such services.  Plaintiff and Class members would not have entrusted their Private Information to Defendant and/or its affiliated companies and entered into these implied contracts with Defendant and/or its affiliated companies without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Defendant and/or its affiliated companies in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

163.    A meeting of the minds occurred, as Plaintiff and Class members agreed and provided their Private Information to Defendant and/or its affiliated companies, and paid for the provided services in exchange for, among other things, both the provision of financial services and the protection of their Private Information.

164.    Plaintiff and Class members performed their obligations under the contract when they paid for Defendant and/or its affiliated companies' services and provided their Private Information.

165.    Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant and/or its affiliated companies gathered when the information was accessed and exfiltrated by the Data Breach.

166.    Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Notice of Privacy Practices. Defendant did not maintain the privacy of Plaintiff's and Class members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and Class members.  Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTC Act, or otherwise protect Plaintiff's and Class members' Private Information as set forth above.

167.    The Data Breach was a reasonably foreseeable consequence of Defendant's action in breach of these contracts.

168.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class members did not receive full benefit of the bargain, and instead received financial and other services that were of a diminished value to that described in the contracts.  Plaintiff and Class members therefore were damaged in an amount at least equal to

the difference in the value of the lending services with data security protection they paid for and the services they received.

169.    Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class members, nor any reasonable person would have utilized services from Defendant and/or its affiliated companies.

170.    As a direct and proximate result of the Data Breach, Plaintiff and Class members have been harmed and suffered, and will continue to suffer, actual damages and injuries including, but not limited to, the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant and/or its affiliated companies.

171.    Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

172.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, for example: (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate identity monitoring to all Class members.

**COUNT IV**

**UNJUST ENRICHMENT/QUASI-CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively,**
**Plaintiff and the New Jersey Subclass)**

173.    Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

174.    This claim is brought in the alternative to Counts II and III, above.

44

175.     Plaintiff and Class members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its affiliated companies and provided Defendant and/or its affiliated companies with their Private Information.  In exchange, Plaintiff and Class members should have received from Defendant the goods and services that were the subject of the transaction and should have been entitled to have Defendant protect their Private Information with adequate data security.

176.     Defendant knew that Plaintiff and Class members conferred a benefit on them and accepted or retained that benefit.  Defendant profited from Plaintiff's and Class members' purchases and used Plaintiff's and Class member's Private Information for business purposes.

177.     Defendant failed to secure Plaintiff's and Class members' Private Information and, therefore, did not provide full compensation for the benefit the Plaintiff's and Class members' Private Information provided.

178.     Defendant acquired the Private Information through inequitable means as they failed to disclose the inadequate security practices previously alleged.

179.     If Plaintiff and Class members knew that Defendant would not secure their Private Information using adequate security, they would not have used Defendant's services.

180.     Plaintiff and Class members have no adequate remedy at law.

181.     Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class members conferred on them.

182.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.  In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class members overpaid for the use of Defendant's services.

## COUNT V

### BREACH OF FIDUCIARY DUTY
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively,
Plaintiff and the New Jersey Subclass)**

183.     Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

184.     In providing their Private Information to Defendant and/or its affiliated companies, Plaintiff and Class members justifiably placed a special confidence in Defendant and/or its affiliated companies to act in good faith and with due regard to interests of Plaintiff and Class members to safeguard and keep confidential that Private Information.

185.     Defendant accepted the special confidence Plaintiff and Class members placed in it, as evidenced by its assertion that it is "committed to protecting the privacy of [Plaintiff's] personal information" as included in the Data Breach notification letter.

186.     In light of the special relationship between Defendant and Plaintiff and Class members, whereby Defendant became a guardian of Plaintiff's and Class members Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its customers, including Plaintiff and Class members for the safeguarding of Plaintiff's and Class member's Private Information.

187.     Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of its customer's relationship, in particular, to keep secure the Private Information of its customers.

188.     Defendant breached its fiduciary duties to Plaintiff and Class members by failing to protect the integrity of the systems containing Plaintiff's and Class member's Private Information.

189.    Defendant breached its fiduciary duties to Plaintiff and Class members by otherwise failing to safeguard Plaintiff's and Class members' Private Information.

190.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to:

       (a)    actual identity theft;

       (b)    the compromise, publication, and/or theft of their Private Information;

       (c)    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

       (d)    lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the cyberattack and Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

       (e)    the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

       (f)    future costs in terms of time, effort, and money that will be expended as result of the cyberattack and Data Breach for the remainder of the lives of Plaintiff and Class members; and

       (g)    the diminished value of Defendant's services they received.

191.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT VI

### BREACH OF CONFIDENCE
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively,
Plaintiff and the New Jersey Subclass)**

192.    Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

193.    At all times during Plaintiff's and Class members' interactions with Defendant, Defendant was fully aware of the confidential, novel, and sensitive nature of Plaintiff's and Class members' Private Information that Plaintiff and Class members provided to Defendant and/or its affiliated companies.

194.    As alleged herein and above, Defendant's relationship with Plaintiff and Class members was governed by expectations that Plaintiff's and Class members' Private Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

195.    Plaintiff and Class members provided their respective Private Information to Defendant and/or its affiliated companies with the explicit and implicit understandings that Defendant would protect and not permit the Private Information to be disseminated to any unauthorized parties.

196.    Plaintiff and Class members also provided their respective Private Information to Defendant and/or its affiliated companies with the explicit understanding that Defendant would take precautions to protect that Private Information from unauthorized disclosure, such as following basic principles of information security practices.

197.    Defendant voluntarily received in confidence Plaintiff's and Class members' Private Information with the understanding that the Private Information would not be disclosed or disseminated to the public or any unauthorized third parties.

198.    Due to Defendant's failure to prevent, detect, and/or avoid the Data Breach from occurring by, *inter alia*, failing to follow best information security practices to secure Plaintiff's and Class members' Private Information, Plaintiff's and Class members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class members' confidence, and without their express permission.

199.    But for Defendant's disclosure of Plaintiff's and Class members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties.  Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class members' Private Information, as well as the resulting damages.

200.    The injury and harm Plaintiff and Class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class members' Private Information.  Defendant knew or should have known its security systems were insufficient to protect the Private Information that is coveted by thieves worldwide.  Defendant also failed to observe industry standard information security practices.

201.    As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

## COUNT VII

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. §501.201, *et seq.*
### (On Behalf of the Nationwide Class)

202.    Plaintiff repeats the allegations contained in paragraphs 1-119 as if fully set forth herein.

203.    Plaintiff brings this claim on behalf of himself and the Nationwide Class.

204.     This cause of action is brought pursuant the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which, pursuant to Fla. Stat. §501.202, requires such claims be "construed liberally" by the courts "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

205.     Defendant's offers, provisions, and sales or services at issue in this case are "consumer transaction[s]" within the scope of FDUTPA.  *See* Fla. Stat. §§501.201-.213.

206.     Plaintiff and Class members are "individual[s]," and are "consumer[s]" as defined by FDUTPA.  *See* Fla. Stat. §501.203(7).

207.     Defendant provided residential mortgage services on Plaintiff's and Class members' behalf.

208.     Defendant offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of FDUTPA. *See* Fla. Stat. §501.203.

209.     Plaintiff and Class members paid for or otherwise availed themselves and received services from Defendant, primarily for personal, family, or household purposes.

210.     Defendant engaged in the conduct alleged in this Complaint, entering transactions intended to result, and which did result, in the procurement or provision of residential mortgage services to or for Plaintiff and Class members.

211.     Defendant's acts, practices, and omissions were done in the course of Defendant's business of offering, providing, and selling residential mortgage services throughout Florida and the United States.

212.    The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding data security, emanated and arose – with respect to Florida Class members, within the state of Florida, within the scope of FDUTPA.

213.    Defendant, operating in Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. §501.204(1), including, but not limited to, the following:

(a)    failing to implement and maintain reasonable and adequate computer systems and data security practices to safeguard customer PII;

(b)    omitting, suppressing, and concealing the material fact that their computer systems and data security practices were inadequate to safeguard customer PII from unauthorized access and theft;

(c)    failing to protect the privacy and confidentiality of Plaintiff's and Class members' PII;

(d)    continuing to accept and store customer PII after Defendant knew or should have known of the security vulnerabilities that were exploited in the Data Breach;

(e)    continuing to accept and store customer PII after Defendant knew or should have known of the Data Breach and before it allegedly remediated the Data Breach; and

(f)    continuing to store and maintain the PII of former customers when Defendant had no legitimate business need to do so.

214.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. §41, *et seq.*, and FDUTPA, Fla. Stat. §501.171(2).

215.     Defendant knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiff's and Class members' PII and that the risk of a data breach or theft was high.

216.     Plaintiff has standing to pursue this claim because as a direct and proximate result of Defendant's violations of FDUTPA.  Plaintiff and Class members have been "aggrieved" by a violation of FDUTPA and bring this action to obtain a declaratory judgment that Defendant's acts, or practices violate FDUTPA.  *See* Fla. Stat. §501.211(a).

217.     Plaintiff also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of FDUTPA.  Plaintiff and the Class are at a substantial and imminent risk of identity theft.  Defendant still possesses Plaintiff's and Class members' PII, and that PII has been both accessed and misused by unauthorized third parties, which is evidence of a substantial and imminent risk of identity theft for Plaintiff and all Class members.

218.     Plaintiff and Class members are entitled to injunctive relief to protect them from the substantial and imminent risk of identity theft, including, but not limited to:

(a)     ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors;

(b)     ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

(c)     ordering that Defendant audit, test, and train security personnel regarding any new or modified procedures;

(d)     ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system;

(e)     ordering that Defendant purge, delete, and destroy customer PII not necessary for its provisions of services in a reasonably secure manner;

(f)     ordering that Defendant conduct regular database scans and security checks;

(g)     ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

(h)     ordering Defendant to meaningfully educate customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps present and former customers should take to protect themselves.

219.    Plaintiff brings this action on behalf of himself and Class members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

220.    The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

221.    Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

222.    Plaintiff and Class members seek relief under FDUTPA, Fla. Stat. §501.201, *et seq.*, including, but not limited to,

(a)     damages, restitution, a declaratory judgment that Defendant's actions and/or practices violate FDUTPA; injunctive relief enjoining Defendant, its employees, parents, subsidiaries, affiliates, executives, and agents from violating FDUTPA;

(b)     ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors;

(c)     ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

(d)     ordering that Defendant audit, test, and train security personnel regarding any new or modified procedures;

(e)     ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system;

(f)     ordering that Defendant purge, delete, and destroy customer PII not necessary for its provisions of services in a reasonably secure manner;

(g)     ordering that Defendant conduct regular database scans and security checks; ordering that Defendant routinely and continually conduct internal training and education to

inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

(h)      ordering Defendant to meaningfully educate customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps current and former customers should take to protect themselves;

(i)      attorneys' fees and costs; and

(j)      any other just and proper relief.

## COUNT VIII

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
**(N.J. Stat. Ann. §56:8-1, *et seq.*)**
**(On Behalf of Plaintiff and the New Jersey Subclass)**

223.   Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

224.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."  N.J. Stat. Ann. §56:8-2.

225.   By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by:

(a)      failing to maintain adequate computer systems and data security practices to safeguard Plaintiff and the Class' PII;

(b)     failing to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft;

(c)     continuing to gather and store PII and other personal information after Defendant knew or should have known of the security vulnerabilities of its computer systems that were exploited in the Data Breach; and

(d)     continuing to gather and store PII and other personal information after Defendant knew or should have known of the unauthorized access and before Defendant allegedly remediated the Data Breach.

226.    These unfair acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, the Gramm-Leach-Bliley Act, and the New Jersey CFA.

227.    The foregoing deceptive acts and practices were directed at New Jersey consumers/purchasers.

228.    Defendant, Plaintiff, and Class members are "persons" within the meaning of N.J. Stat. Ann. §56:8-1(d).

229.    Defendant engaged in "sales" of "merchandise" (including services) within the meaning of N.J. Stat. Ann. §56:8-1(c) & (e).

230.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the character of the financial services provided, specifically as to the safety and security of Plaintiff and the Class' Private Information and induce consumers to purchase the same.

231.    Defendant's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth in the above paragraphs are material in that they relate to matters which reasonable persons, including Plaintiff and members of the Class, would attach

56

importance to in making their purchasing decisions or conducting themselves regarding the purchase of services from Defendant.

232.    Class members are New Jersey consumers who made payments to Defendant for the furnishing of financial services that were primarily for personal, family, or household purposes.

233.    Defendant engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the furnishing of services to consumers, including Plaintiff and Class members.  Defendant's acts, practices, and omissions were done in the course of Defendant's business of marketing, offering to sell, and furnishing of loan services to consumers in the State of New Jersey.  As a direct and proximate result of Defendant's multiple, separate violations of N.J. Stat. Ann. §56:8-2, Plaintiff and Class members suffered ascertainable losses damages including, but not limited to:

(a)    actual identity theft;

(b)    the compromise, publication, and/or theft of their PII;

(c)    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII;

(d)    lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

(e)    the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

(f)     future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class members; and

(g)     the diminished value of Defendant's services they received.

234.    Also, as a direct result of Defendant's violation of the New Jersey CFA, Plaintiff and Class members are entitled to damages as well as injunctive relief, including, but not limited to, ordering Defendant to: (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate identity monitoring to all Class members.

235.    Plaintiff and Class members were injured because: (a) they would not have purchased services from Defendant had they known the true nature and character of Defendant's data security practices; (b) Plaintiff and Class members would not have entrusted their PII to Defendant in the absence of promises that Defendant would keep their information reasonably secure; and (c) Plaintiff and Class members would not have entrusted their PII to Defendant in the absence of the promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

236.    As a result, Plaintiff and Class members have been damaged in an amount to be proven at trial.

237.    On behalf of himself and other members of the Class, Plaintiff is entitled to recover legal and/or equitable relief, including an order enjoining Defendant's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. §56:8-19, and any other just and appropriate relief.

**COUNT IX**

**DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively,**
**Plaintiff and the New Jersey Subclass)**

238.     Plaintiff incorporates by reference paragraphs 1-119, as though fully set forth herein.

239.     Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

240.     An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their PII will occur in the future.

241.     The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

242.     Defendant still possesses the PII of Plaintiff and the Class.

243.     To Plaintiff's knowledge, Defendant has made no changes to its data storage or security practices relating to the PII.

244.     To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

245.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach by Defendant.  The risk of another such breach is real, immediate, and substantial.

246.     The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs by Defendant, Plaintiff and Class members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

247.     Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach by Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other consumers whose PII would be further compromised.

248.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendant implement and maintain reasonable security measures, including, but not limited to, the following:

(a)     Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

(b)     engaging third-party security auditors and internal personnel to run automated security monitoring;

(c)      auditing, testing, and training its security personnel regarding any new or modified procedures;

(d)      purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

(e)      conducting regular database scans and security checks; and

(f)      routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendant, as follows:

A.      For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;

B.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

C.      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained by Defendant as a result of its wrongful conduct;

E.      Ordering Defendant to pay for no less than three years of identity monitoring services for Plaintiff and the Class;

F.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.      For an award of punitive damages, as allowable by law;

H.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.      Pre- and post-judgment interest on any amounts awarded; and

J.      Such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  January 5, 2023                         ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                                STUART A. DAVIDSON
                                                BRADLEY BEALL
                                                NICOLLE BRITO


                                                    **Stuart A. Davidson**
                                                  STUART A. DAVIDSON

                                                120 East Palmetto Park Rd., Suite 500
                                                Boca Raton, FL  33432
                                                Telephone:  561/750-3000
                                                561/750-3364 (fax)
                                                sdavidson@rgrdlaw.com
                                                bbeall@rgrdlaw.com
                                                nbrito@rgrdlaw.com

KANTROWITZ GOLDHAMER
   & GRAIFMAN, P.C.
GARY S. GRAIFMAN*
MELISSA R. EMERT*
135 Chestnut Ridge Road, Suite 200
Montvale, NJ  07645
Telephone:  201/391-7000
201/307-1086 (fax)
ggraifman@kgglaw.com
memert@kgglaw.com

Attorneys for Plaintiff and the Class

* *Pro hac vice* forthcoming